**NOT FOR PUBLICATION** **CLOSED**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|   |   |   |
|---|---|---|
| SCHOLES ELECTRIC & COMMUNICATIONS, INC., | : : : : | |
| Plaintiff, | : : | |
| v. | : : | CIVIL ACTION NO. 04-3898 (JAP) |
| WILLIAM FRASER, et al., | : : : | **OPINION** |
| Defendants. | : : | |

APPEARANCES:

Jay Scott MacNeill, Esq.
POST, POLAK, GOODSELL,
MACNEILL, & STRAUCHLER, P.A.
425 Eagle Rock Avenue
Roseland, NJ 07068-1717
    Attorneys for Plaintiff

Brian S. Cousin, Esq.
Jonathan E. Goldberg, Esq.
Ronald B. Weisenberg, Esq.
GREENBERG TRAURIG, LLP
200 Campus Drive
P.O. Box 677
Florham Park, NJ 07932-0677
    Attorneys for Defendants

PISANO, District Judge.

Plaintiff, Scholes Electric & Communications, Inc. ("Scholes") brought suit against Defendants William Fraser, Daniel Hunter, William R. Johnson, and Michael Rosen (collectively, the "Defendants"), who are former officers and directors of Carlson Implementation Associates ("Carlson Implementation").[1]  Plaintiff claims that the Court should pierce the corporate veil and hold Defendants liable for monies due Plaintiff pursuant to certain contracts between Plaintiff and Carlson Implementation.  Plaintiff further alleges that Defendants are personally liable for conversion.  Currently before the Court is Defendants' motion for summary judgment.  For the following reasons, the Court grants the instant motion.[2]

## I. Factual History

Plaintiff is a New Jersey corporation engaged in the business of electrical contracting. Defendants were corporate principals of Carlson Implementation, a construction manager or general construction contractor and wholly-owned subsidiary of Carlson Group, Inc. ("Carlson Group").  Carlson Group was also the sole parent company of several other separate, but affiliated subsidiaries, collectively termed, the "Carlson entities."

Defendants Fraser, Johnson, and Hunter purchased Carlson Group in 1993 after working there for many years.  They assumed positions as officers and directors of Carlson Group and its subsidiaries, including Carlson Implementation.  Defendant Rosen was hired as Chief Financial

---

[1] Jurisdiction is premised on 28 U.S.C. § 1332.  Plaintiff is a New Jersey corporation. None of the Defendants are citizens of New Jersey.  Plaintiff claims damages in excess of $75,000.00.

[2] The Court resolves this motion without oral argument as it is permitted to do under Fed. R. Civ. P. 78.

2

Officer of the Carlson Group and its subsidiaries in January, 1997. While Defendants Fraser, Johnson, Hunter, and Rosen were managing the affairs of the Carlson Group and its related entities, Carlson Implementation entered into two contractual relationships which are the focus of this dispute.

### A.     The Bank of New York Agreement

On November 2, 2001, Carlson Implementation entered into a contract with Bank of New York for construction of a print shop in Secaucus, New Jersey. Pursuant to this contract, Carlson Implementation was to act as the construction manager for the project. On February 7, 2002, Carlson Implementation signed a subcontract with Adco Electric Corporation ("Adco"). Adco is a New York corporation which is Plaintiff's corporate affiliate. The subcontract between Carlson Implementation and Adco provided that Adco would perform all electrical work for the Bank of New York project for a sum of $887,100.00. Defendants were not signatories to either of these contracts. Adco verbally designated Plaintiff, its affiliate, to perform this electrical work. Plaintiff performed the electrical work as specified in the contract.

Plaintiff claims that Carlson Implementation received payment in full for its work from Bank of New York; however, Plaintiff alleges that Carlson Implementation only paid Adco $387,170.00 for the work performed on the project. Adco has assigned its claims for unpaid services on the Bank of New York project to Plaintiff. Accordingly, the Court will refer to Plaintiff as the party to the Bank of New York subcontract. Plaintiff claims that Carlson Implementation owes it $500,000.00.

### B.     The Deutsche Bank Agreement

On April 9, 2002, Carlson Implementation entered into a construction management

agreement with Deutsche Bank in which Carlson Implementation agreed to construct a data center for Deutsche Bank in Parsippany, New Jersey. Carlson Implementation entered into a subcontract with Plaintiff on June 3, 2002. The subcontract provided that Plaintiff would perform the electrical work on the Deutsche Bank data center for $3,018,235.64. Defendants were not signatories to either of these contracts. Plaintiff performed the requisite electrical work. Plaintiff states that although Deutsche Bank paid Carlson Implementation in full for the work performed by Plaintiff, Carlson Implementation only paid Plaintiff $1,379,307.64 for its services. Plaintiff accordingly asserts a claim for the remaining balance under the contract of $1,638,928.00.

    C.    **Bankruptcy Proceedings**

Carlson Group, Carlson Implementation, and the other Carlson entities, encountered significant financial problems beginning in 2001. In 2002, Defendants were forced to close a number of offices and lay off employees. The companies filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Massachusetts, Eastern Division (the "Bankruptcy Court") on March 12, 2003.[3] On September 24, 2003, the Bankruptcy Court appointed Craig Jalbert as Liquidating Supervisor of the respective bankruptcy estates.[4] The bankruptcy is still pending and the Carlson entities are currently being liquidated.

---

[3] Defendants assert that Carlson Implementation filed for bankruptcy in March, 2004, citing paragraph 16 of Plaintiff's Complaint. However, in paragraph 16, Plaintiff states that bankruptcy was filed on March 12, 2003. Further, the docket number for the bankruptcy action, titled In re CGI Liquidation, Inc. et al. (f/k/a Carlson Group, Inc. et al.), is No. 03-12032 which indicates that the action was filed in 2003 not 2004.

[4] The Liquidating Supervisor serves the role that a bankruptcy trustee would serve if the estate were not being liquidated.

Plaintiff filed a proof of claims with the Bankruptcy Court for work it performed on the Bank of New York and Deutsche Bank projects. As of December 23, 2005, Plaintiff recovered approximately ten percent (10%) of its filed claims in the bankruptcy proceeding. It appears that Plaintiff recovered approximately $50,254.01 for its work on the Bank of New York project and approximately $159,000.00 for its work on the Deutsche Bank project. See MacNeill Declaration at ¶12 (Dec. 23, 2005).

## II.     Procedural History

Plaintiff commenced this action in the Superior Court of New Jersey, Law Division, Middlesex County on June 28, 2004. Defendants removed the matter to this Court pursuant to 28 U.S.C. § 1441 on August 13, 2004. Plaintiff filed an amended complaint on August 19, 2004. Defendants then filed a motion to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(5), and 12(b)(6). The Court denied Defendants' motion to dismiss without prejudice on December 21, 2004.

Plaintiff filed a second amended complaint, which is the operative complaint, on October 20, 2005. Plaintiff claims that Carlson Implementation received full payment from Bank of New York and Deutsche Bank for the services it performed on their respective construction projects. Plaintiff claims that instead of paying Plaintiff for the work it performed pursuant to the subcontracts, Defendants diverted money from Carlson Implementation to the other Carlson entities to satisfy outstanding debts of those entities. Defendants' alleged diversion of such funds dissipated the assets of Carlson Implementation and subsequently, Carlson Implementation declared bankruptcy and was unable to pay Plaintiff for the work it performed on the Bank of New York and Deutsche Bank projects.

The specific causes of action in the second amended complaint are summarized as follows. First, Plaintiff claims that Defendants were negligent by breaching the affirmative duty they owed to Plaintiff to conduct the affairs of Carlson Implementation reasonably and not to commingle the funds of Carlson Implementation with those of the other Carlson entities. Plaintiff also alleges that Defendants could be held liable for Carlson Implementation's contractual debts on a theory of piercing the corporate veil or under the participation theory of liability. Plaintiff further claims that Defendants wrongfully converted Plaintiff's funds.[5]

Defendants filed the instant motion for summary judgment on November 23, 2005. Defendants argue that Plaintiff is twisting what should be a breach of contract claim against insolvent Carlson Implementation into improper conversion and veil piercing claims against Defendants in an attempt to recover the contractual damages it was not able to recover through the bankruptcy liquidation process.

On May 4, 2006, the Court entered an order dismissing Plaintiff's causes of action for negligence and finding that Plaintiff cannot be held liable for Carlson Implementation's debts on the relevant contracts pursuant to the participation theory of liability. The Court concluded that it was left with two outstanding issues: (1) whether it should pierce the corporate veil to hold Defendants liable for Carlson Implementation's breach of its contracts with Plaintiff based on Defendants' intentional commingling of funds amongst the Carlson entities and conducting the affairs of these separate entities as one company; and (2) whether Defendants are personally liable for the tort of conversion for using the money due Plaintiff pursuant to its contracts with Carlson Implementation to satisfy debts of the other Carlson entities.

---

[5] The conversion count first appeared in the second amended complaint.

Furthermore, in light of these outstanding issues, the Court gave the parties the opportunity to supplement their briefs to address: (1) whether the funds received by Carlson Implementation from Deutsche Bank and Bank of New York for electrical work performed by Plaintiff are the property of Plaintiff or the property of Carlson Implementation; (2) whether Plaintiff, as a creditor of the insolvent Carlson Implementation, has standing to bring this suit against Defendants; and (3) assuming Plaintiff has standing to bring this action, whether the circumstances of this cases constitute the requisite fraud or injustice required to warrant the extraordinary remedy of piercing the corporate veil to hold Defendants liable for Carlson Implementation's contractual debts.

### III.  Standard of Review

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are critical or "material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine, fact issue compels a trial. Id. at 324. In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party.  Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).  The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial.  Anderson, 477 U.S. at 249.  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment.  Big Apple BMW v. BMW of North America, 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV.  Legal Discussion

The Court must consider whether Defendants should be held liable for the funds due Plaintiff pursuant to its contracts with Carlson Implementation under either a theory of conversion or a theory of piercing the corporate veil.  Pursuant to New Jersey law, the tort of conversion is the "wrongful exercise of dominion and control over property owned by another in a manner inconsistent with the owner's rights.  See, e.g., Advanced Enterprises Recycling, Inc. v. Bercaw, 869 A.2d 468, 472 (N.J. Super. App. Div. 2005).  Plaintiff claims that this act of conversion imposes personal liability on the Defendants.  See, e.g., Charles Bloom & Co. v. Echo Jewelers, 652 A.2d 1238, 1243 (N.J. Super. Ct. App. Div. 1995) (indicating that corporate principals may be held personally liable for their own torts).

Plaintiff also allege that Defendants' purported conversion of Plaintiff's funds provides the predicate fraud or injustice to warrant piercing the corporate veil to hold Defendant liable for Carlson Implementation's contractual debts.  Piercing the corporate veil in such a manner is an extraordinary remedy.  New Jersey law is clear that a corporation is a separate entity from its corporate principals.  See, e.g., State Dep't of Environ. Prot. v. Ventron Corp., 468 A.2d 150,

8

164 (N.J. 1983). In fact, the essence of incorporation is to insulate corporate principals from personal liability for corporate acts. See id. However, where the corporation is being used by its principals to perpetrate fraud, injustice, or the like, a court may pierce the corporate veil to impose liability on corporate principals. Id.

While the tort of conversion and the doctrine of piercing the corporate veil are distinct legal concepts, they are intertwined in this case. As explained below, Plaintiff cannot recover against Defendants under either legal theory because the funds at issue belonged to Carlson Implementation, and thus, were not Plaintiff's property.

The New Jersey Appellate Division made clear that in order to establish conversion, the money converted "must have belonged to the injured party." See, e.g., Advanced Enterprises Recycling, 869 A.2d at 472. When money, as opposed to tangible property, is the subject of a conversion claim, New Jersey courts require that a plaintiff show something more than a contractual obligation on the part of a defendant to pay the plaintiff to establish conversion. See id. ("An action for conversion will not lie in the context of a mere debt . . . ."). The plaintiff must show that the money in question was identifiably the plaintiff's property or that the defendant was obligated to segregate such money for the plaintiff's benefit. See Communications Programming, Inc. v. Summit Manufacturing, Inc., No. 98-253, 1998 WL 329265, at *5 (D.N.J. June 16, 1998) (holding that plaintiff did not establish a claim for conversion of commissions due under a contract because he failed to show that the money converted belonged to him); Hirsch v. Phily, 73 A.2d 173, 176-77 (N.J. 1950) (holding that plaintiff set forth a prima facie case of conversion of its money where defendant diverted proceeds from accounts receivable which were specifically assigned to plaintiff for its own use);

9

Glenfeld Financial Corp. v. Penick Corp., 647 A.2d 852, 861 (N.J. Super. Ct. App. Div. 1994) (finding that defendant converted plaintiff's property by "diverting payments from customers which it had agreed to place in a blocked account for [plaintiff's] benefit into [defendant's] operating accounts"); Commercial Ins. Company of Newark v. Apgar, 267 A.2d 559, 564-65 (N.J. Super. Ct. Law Div. 1970) (finding that defendant was not liable for conversion of insurance premiums due plaintiff because defendant was under no obligation to place premiums in trust for plaintiff's benefit).[6]

Courts in other jurisdictions are in accord. See, e.g., DeChristofaro v. Machala, 685 A.2d 258, 263 (R.I. 1996) (holding that homeowner could not maintain conversion claim against contractor where contract between the parties "placed no obligation upon defendant to keep intact *in specie* the money paid by plaintiffs"); Willingham v. United Ins. Co. of America, 628 So.2d 328, 333 (Ala. 1993) (stating that defendant did not commit conversion of insurance premiums where "no evidence leads us to conclude that the subject money is or was in any manner segregated or identifiable."); see also 18 Am. Jur. 2d (Conversion) § 7 ("The general rule is that monies are intangible and, therefore, not subject to a claim for conversion, however, an

---

[6] It is important to make the distinction between money that is identical and money that is identifiable. Plaintiff argues that to establish conversion, it need not establish an absolute identity of money. See Commercial Ins. Co. of Newark v. Apgar, 267 A.2d 559, 562 (N.J. Super. Ct. Law Div. 1970). However, even if this assertion is correct, Plaintiff must still show that the money converted by Defendants belonged to him. See Commercial Ins. Co. of Newark, 267 A.2d at 562 ("[i]t is essential that the money converted by a tortfeasor must have belonged to the injured party. The tort is not limited, however, to cases where the defendant was obligated to deliver to the owner the identical property . . . ."). For example, in Commercial Ins. Co. of Newark v. Apgar, the court held that the defendant was not liable for conversion of insurance premiums due plaintiff not because plaintiff failed to establish the absolute identity of the money owed, but because defendant was under no obligation to place premiums in trust or otherwise segregate the monies for plaintiff's benefit. Id. at 564-65.

exception exists when a plaintiff can allege that the defendant converted specific segregated or identifiable funds . . . ."); 90 C.J.S. (Trover and Conversion) § 16 ("The general rule is that money is an intangible and, therefore, not subject to a claim for conversion. However, an exception exists when a plaintiff can allege that the defendant converted specific segregated or identifiable funds.").

      Based on the foregoing, the Court holds that the funds received by Carlson Implementation from Deutsche Bank and Bank of New York for the work performed by Plaintiff on their respective construction projects were not Plaintiff's property. It is undisputed that pursuant to the sub-contracts between Plaintiff and Carlson Implementation for the Deutsche Bank and Bank of New York construction projects, Carlson Implementation was obligated to pay Plaintiff within ten days of receiving payment from the building owner. It is also undisputed that Carlson Implementation did in fact receive payment from Deutsche Bank and Bank of New York for Plaintiff's electrical work on the respective projects. It is further undisputed that Michael Rosen, Chief Financial Officer of Carlson Implementation, knew that Carlson Implementation was contractually obligated to pay Plaintiff for its work on the projects. See Rosen Dep. at 18:16-23.

      However, none of these facts warrant the conclusion that Defendants converted Plaintiff's property. The relevant sub-contracts between Plaintiff and Carlson Implementation do not require that Carlson Implementation segregate the funds ultimately due Plaintiff for its electrical work upon receipt from the building owners. Neither sub-contract mandates that Carlson Implementation place such funds in trust for Plaintiff, establish a blocked or escrow account to benefit Plaintiff, or otherwise segregate the funds upon receipt. Carlson Implementation, on its

11

own initiative, did not set up such a trust or account to benefit Plaintiff. Accordingly, the funds at issue were not sufficiently segregated or identifiable to be considered Plaintiff's property.

Plaintiff cites to no case law which would support its proposition that a mere contractual obligation, without something more, creates property rights sufficient to sustain a claim for conversion. Instead, to counter the presence of numerous cases which indicate that to show conversion, the money at issue be sufficiently segregated or identifiable, Plaintiff argues that upon receipt of the funds by Carlson Implementation from the building owners, the money was placed in a constructive trust for Plaintiff's benefit pursuant to New York lien law. This argument is unfounded because New York law does not apply to this case.

Plaintiff does not claim that the relevant contracts on the Bank of New York project provide for the application of New York law. The Court's own review of the contracts indicate that New Jersey law applies to the Bank of New York construction project. Section 9.3.4 of the contract between Carlson Implementation and Bank of New York, which was incorporated into Plaintiff's sub-contract with Carlson Implementation, provides that "[t]he Contract shall be governed by the law of the place where the Project is located." The project was located in Secaucus, New Jersey.

Plaintiff specifically admits on page 18 of its opposition brief that New York law does not apply to the Deutsche Bank project; however, Plaintiff asks the Court to use New York law as a framework for determining that the funds at issue were the property of Plaintiff.[7] The Court

---

[7] It appears that the terms of the construction management agreement between Carlson Implementation and Deutsche Bank, as well as the language of N.Y. Lien Law § 70 (McKinney 2006) reject the application of New York law to this case. Although paragraph 13 of the construction management agreement states that the agreement is governed by New York law, the general terms and conditions incorporated into that contract specifically provide that "[t]hese

12

declines to do so.  This dispute is subject to New Jersey law.  If New Jersey did not specifically enact a provision that would impose a constructive trust for Plaintiff's benefit under these circumstances, the Court will not do so.  If Plaintiff wanted the protection of New York lien law, it should not have contracted to perform services in New Jersey.

Accordingly, based on the foregoing, when Carlson Implementation received payment from Deutsche Bank and Bank of New York for the construction work, such funds became the property of Carlson Implementation.  Thus, Plaintiff cannot establish a cause of action for conversion because it is not the property owner.  Any cause of action against Defendants for conversion of these funds belongs to Carlson Implementation.  Since Carlson Implementation is currently being liquidated in bankruptcy, the Liquidating Supervisor of the bankruptcy estate has the authority to bring such a claim.  See, e.g., In re Buildings by Jamie, Inc., 230 B.R. 36, 41 (D.N.J. 1998) (stating that a trustee liquidating a bankruptcy estate has the capacity to sue in order to collect estate property for distribution to the estate's creditors).

Since the funds at issue belong to Carlson Implementation, Plaintiff is also not entitled to pierce the corporate veil to hold Defendants liable for Carlson Implementation's contractual debts to Plaintiff.  A creditor, such as Plaintiff, only has standing to seek to pierce the corporate veil of an insolvent corporation to hold its former corporate principals liable for corporate acts if

---

General Terms and Conditions *and the Agreement* shall be governed by and construed in accordance with the laws of the State of New York as such laws are applied to *agreements entered into and performed entirely within New York* between New York residents . . . ."  The Deutsche Bank projected was located in Parsippany, New Jersey, not in New York.  Further, section 70 appears to limit the application of New York lien law to the improvement of real property within New York; however, given Plaintiff's concessions and the language of the contract, the Court need not undertake the task of interpreting New York law at this time.  N.Y. Lien Law § 70 (McKinney 2006).

the claim at issue is particular or personal to that creditor; however, if the claim at issue is general to all creditors, the trustee of the insolvent corporation, or in this case, the Liquidating Supervisor, must bring the claim to recover on behalf of the company and its creditors.  See Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, 296 F.3d 164, 170 & n.8 (3d Cir. 2002) (stating that trustee has standing to pursue claims against corporate debtor's principals which are general to all creditors while creditor has standing to pursue claims that are personal to that particular creditor);[8] In re Buildings by Jamie, Inc., 230 B.R. at 43 (finding that creditors did not have standing to pursue veil piercing claim against corporate debtor's principals where creditors did not suffer particular injury, but were harmed collectively by removal of property from the bankruptcy estate).  Defendants' diversion of Carlson Implementation's money to satisfy the debts of the other Carlson entities, if anything, resulted in a general injury to all creditors because this diversion dissipated the assets of the bankruptcy estate which would have been used to equitably satisfy Carlson Implementation's outstanding debts to all of its creditors. Accordingly, Plaintiff does not have standing to pursue veil piercing claims against Defendants

---

[8]  While the legal principles in Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, 296 F.3d 164 (3d Cir. 2002) apply to the instant case, the ultimate result in that case was different due to the presence of different factual circumstances.  In that case, a pension fund sued the former corporate principals of an insolvent corporation to recover $9.3 million in withdrawal liability that the corporation incurred when, after filing for bankruptcy, it ceased paying contributions to the fund.  Foodtown, 296 F.3d at 167.  The court found the plaintiff had standing to pursue the action because defendant's withdrawal liability was not part of the bankruptcy estate and resulted in an injury personal to the plaintiff.  Id. at 170.  The instant matter is distinguishable because, as the Court explained above, the funds at issue here were the property of the Carlson Implementation.  Accordingly, unlike the plaintiff's injury in Foodtown, which was based on a distinct, statutory liability which occurred after the company filed for bankruptcy, Plaintiff's injury, if any, is that similar to other creditors, it was wronged by the lack of sufficient assets in the bankruptcy estate to satisfy the outstanding debts.

for their alleged wrongful diversion of Carlson Implementation's money. This claim must also be brought by the Liquidating Supervisor of the bankruptcy estate. See Phar-Mor, Inc. v. Coopers & Lybrand, 22 F.3d 1228, 1240 n.20 (3d Cir. 1994) (stating that pursuant to New Jersey law, a debtor corporation may pierce its own veil to prevent inequity or unfairness); In re Buildings by Jamie, Inc., 230 B.R. at 43 (holding that trustee of bankruptcy estate had standing to purse veil piercing claims against principals of corporate debtor). To hold otherwise would effectively nullify the Bankruptcy Court's liquidation of Carlson Implementation and subsequent distribution to the corporation's creditors and result in a flood of separate actions in the district court by each creditor to recover against Defendants for the company's debts. Cf. Koch Refining v. Farmers Union Central Exchange, 831 F.2d 1339, 1342-43 (7th Cir. 1987) (indicating that the trustee's efforts in reaching estate property for distribution to all creditors "eliminates the many wasteful and competitive suits of individual creditors").

Whether Carlson Implementation itself, through the Liquidating Supervisor of its bankruptcy estate, should seek to pierce its own veil to hold Defendants liable for using its money to satisfy the debts of the other Carlson entities, or otherwise seek to hold Defendants liable for conversion of its funds is not a question currently before the Court. Contrary to Plaintiff's assertions, whether or not the Liquidating Supervisor has in fact waived its right to pursue such claims is immaterial.[9] Even if the Liquidating Supervisor waived veil piercing and

---

[9] There is some dispute over whether the Liquidating Supervisor abandoned the instant claims against Defendants. The Liquidating Supervisor's motion to abandon certain claims in the bankruptcy action indicates that it is abandoning claims against the Defendants for breach of fiduciary duties, deepening of insolvency, fraud, malfeasance, misrepresentation, misappropriation, waste, gross negligence, and negligence. The Liquidating Supervisor explicitly stated that it could not successfully pursue such claims against Defendants. The notice

conversion claims against Defendants or has no intention of ever pursuing those claims, its failure to commence such litigation does not create a right in Plaintiff to pursue claims that it is not legally entitled to pursue. Due to the particular circumstances of this case, Plaintiff's remedy is limited to recovery as a creditor in the Bankruptcy Court. As indicated above, Plaintiff pursued this remedy and in fact, recovered some money in satisfaction of Carlson Implementation's contractual debts to Plaintiff through liquidation of the bankruptcy estate. Although Plaintiff likely will not recover the total amount due through the bankruptcy process, this is the unfortunate reality of dealing with a corporate entity that ultimately becomes insolvent.

### V. Conclusion

In conclusion, for the above reasons, the Court finds that no genuine issue of material fact exists and accordingly, grants summary judgment in favor of Defendants. This matter is hereby closed. An appropriate order accompanies this opinion.

Dated: June 14, 2006                                                /s/ JOEL A. PISANO
                                                                    United States District Judge

Original:    Clerk
cc:          Judge Arleo
             All Parties
             File

---

makes no specific mention of a claim for liability based on a theory of veil piercing or of a claim for conversion.